**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED

*November 09, 2022*

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**CARLOS FAVIAN MARTINEZ,**<br>a/k/a "Cuate,"<br>**MARCO ANTONIO MEDINA,**<br>**RIGOBERTO BROWN,**<br>**PEDRO ANTONIO CALVILLO**<br>**HERNANDEZ,**<br>**ROBERTO GARCIA VILLARREAL,**<br>a/k/a "Betin,"<br>**MIGUEL HIPOLITO CABALLERO**<br>**AUPART,**<br>**SANDRA GUERRA MEDINA,**<br>**MIREYA MIRANDA,**<br>**DIEGO CEBALLOS-SOTO,**<br>**CARLOS YZAGUIRRE,**<br>**JUAN HECTOR RAMIREZ AVILA,**<br>a/k/a "Juanito," and<br>**JOSE de JESUS TAPIA FERNANDEZ,**<br><br>Defendants. | **CRIMINAL NO.**    **4:22-cr-560**<br><br>**UNDER SEAL**<br><br>Count 1: 15 U.S.C. § 1<br>(conspiracy to price fix and allocate<br>the market)<br>Count 2: 15 U.S.C. § 2<br>(conspiracy to monopolize)<br>Count 3: 18 U.S.C. § 1951(a)<br>(Hobbs Act extortion conspiracy)<br>Count 4: 18 U.S.C. §§ 1951(a) and 2<br>(Hobbs Act extortion)<br>Count 5: 18 U.S.C. § 1956<br>(international money laundering<br>conspiracy)<br>Counts 6-11: 18 U.S.C. §§ 1956 and 2<br>(money laundering) |

**INDICTMENT**

**THE GRAND JURY CHARGES THAT:**

At all times relevant to this Indictment, unless otherwise noted:

<u>**COUNT ONE**</u>

**Conspiracy to Fix Prices and Allocate the Market
(15 U.S.C. § 1)**

<u>**Description of the Offense**</u>

1.      Beginning in or about 2011 and continuing to at least as late as on or about

November 9, 2022, the exact dates being unknown to the Grand Jury, in the Southern District of

Texas and elsewhere, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate,"
MARCO ANTONIO MEDINA,
RIGOBERTO BROWN,
PEDRO ANTONIO CALVILLO HERNANDEZ,
ROBERTO GARCIA VILLARREAL, a/k/a "Betin,"
MIGUEL HIPOLITO CABALLERO AUPART,
SANDRA GUERRA MEDINA,
MIREYA MIRANDA,**

and co-conspirators known and unknown to the Grand Jury, knowingly entered into and engaged

in a conspiracy to suppress and eliminate competition by fixing prices and allocating the market

for transmigrante forwarding agency services in and around the Los Indios, Texas Port of Entry

and the Brownsville-Harlingen, Texas metropolitan area that includes, among other places,

Cameron and Hidalgo Counties and the cities and towns of San Benito and Los Indios (the "Los

Indios, Texas area"), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.      The conspiracy engaged in by the defendants and co-conspirators was a *per se*

unlawful, and thus unreasonable, restraint of interstate and foreign trade and commerce in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Defendants and Co-Conspirators**

3.      Defendant CARLOS FAVIAN MARTINEZ ("MARTINEZ"), a/k/a/ "Cuate," was a U.S. citizen who resided in the Southern District of Texas in the city of Mission, Texas. MARTINEZ controlled AGENCY C, a transmigrante forwarding agency that operated in the Los Indios, Texas area. MARTINEZ was the son-in-law of a former leader of the Gulf Cartel in Mexico. The Gulf Cartel is a violent criminal syndicate that operates at the U.S.-Mexico border and elsewhere.

4.      Defendant MARCO ANTONIO MEDINA ("MEDINA") was a U.S. citizen who resided in the Southern District of Texas. MEDINA, on behalf of MARTINEZ, operated AGENCY C, where he also reported to MARTINEZ.

5.      Defendant RIGOBERTO BROWN ("BROWN") was a dual citizen of Mexico and the United States. BROWN performed managerial roles on behalf of MARTINEZ.

6.      Defendant PEDRO CALVILLO HERNANDEZ ("CALVILLO") was a Mexican national. CALVILLO reported to MEDINA and MARTINEZ and carried out instructions from MEDINA and MARTINEZ.

7.      Defendant ROBERTO GARCIA VILLARREAL ("GARCIA"), a/k/a "Betin," was a Mexican national who resided in Cameron County, Texas as a legal permanent resident. GARCIA operated AGENCY L, a transmigrante forwarding agency that operated in the Los Indios, Texas area.

8.      Defendant MIGUEL HIPOLITO CABALLERO AUPART ("CABALLERO") was a Mexican national who resided in the Southern District of Texas as a legal permanent resident. CABALLERO owned, operated, and controlled AGENCY A, a transmigrante forwarding agency that operated in the Los Indios, Texas area.

9.      Defendant SANDRA GUERRA MEDINA ("GUERRA") was a U.S. citizen who resided in the Southern District of Texas. GUERRA owned, operated, and controlled AGENCY T, a transmigrante forwarding agency that operated in the Los Indios, Texas area.

10.     Defendant MIREYA MIRANDA ("MIRANDA") was a Mexican national who resided in the Southern District of Texas as a legal permanent resident. MIRANDA owned, operated, and controlled AGENCY M, a transmigrante forwarding agency that operated in the Los Indios, Texas area.

11.     Various companies and individuals, known and unknown to the Grand Jury, participated as unindicted co-conspirators to commit the offense charged in this count and performed acts and made statements in furtherance of it.

12.     Whenever in this count reference is made to any act, deed, or transaction of any corporate entity, the allegation means that the corporate entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

### Background

13.     Transmigrantes are individuals who transport goods, often used vehicles, from the United States, through Mexico, for resale elsewhere in Central America.

14.     The government of Mexico regulates transmigrante traffic: until in or about March 2021, transmigrantes had to use the Los Indios, Texas Port of Entry to cross from the U.S. to Mexico. The Los Indios Port of Entry includes a bridge (known as the "Los Indios Free Trade Bridge" or the "Free Trade International Bridge") that spans the Rio Grande River and connects Los Indios, Texas with Matamoros, Tamaulipas in Mexico. Moreover, as required by Mexican

regulations, transmigrantes must complete customs paperwork and permitting to travel through Mexico. "Patentes" are licensed, registered brokers who are bonded and authorized by the government of Mexico to process transmigrante paperwork.

15.     A transmigrante forwarding agency provides services to transmigrantes. Transmigrante agencies, for example, assist transmigrantes in completing customs paperwork and paying fees as required by the Mexican government. Transmigrante agencies charge transmigrantes fees for the services they provide. Typically, these agency fees are based on the type and number of used vehicles a transmigrante transports.

16.     From in or about 2011 and continuing to at least as late as on or about November 9, 2022, the transmigrante forwarding agencies owned, operated, and controlled by defendants MARTINEZ, MEDINA, CABALLERO, GUERRA, and MIRANDA provided services to transmigrante clients. Moreover, these agencies held exclusive relationships with registered patentes. Other transmigrante agencies without the same patente relationships had to access broker services through these defendants' agencies.

**Manner and Means of the Conspiracy**

17.     For the purpose of forming and carrying out the charged conspiracy, defendants MARTINEZ, MEDINA, BROWN, CALVILLO, GARCIA, CABALLERO, GUERRA, MIRANDA, and their co-conspirators did those things that they combined and conspired to do, including, among other things:

        a.     engaged in communications and discussions—including at in-person meetings and via telephones, text messages, social media, and online messaging platforms—regarding pricing of transmigrante agency services in and around the Los Indios, Texas area and the division of revenue from those services;

b.      agreed during those communications and discussions to fix, maintain, stabilize, raise, and lower the price of transmigrante agency services in and around the Los Indios, Texas area;

c.      agreed during those communications and discussions to allocate the market for transmigrante agency services in and around the Los Indios, Texas area by pooling together agencies' revenues and dividing those revenues among the agencies pursuant to agreed-upon percentages—an arrangement known as "The Pool;"

d.      issued price announcements and divided agency revenues in accordance with agreements reached;

e.      created charts and spreadsheets to document, monitor, and implement the agreement to allocate the market by pooling and dividing revenues;

f.      marketed, provided, and accepted payments for transmigrante agency services in and around the Los Indios, Texas area at collusive and noncompetitive prices;

g.      monitored, discussed, and punished co-conspirators who cheated on or were non-compliant with the agreement to fix prices and allocate the market; and

h.      deterred, through means including threats and acts of violence, new entrants and disruptive outsiders who posed a threat to the stability, operation, or continued existence of the price-fixing and market-allocation conspiracy.

## **Trade and Commerce**

18.    The business activities of transmigrante forwarding agencies that are the subject of this Indictment were within the flow of, and substantially affected, interstate commerce, including but not limited to:

a.        defendants and their co-conspirators sold and delivered transmigrante agency services in a continuous and uninterrupted flow of interstate commerce to transmigrante customers transporting goods across state lines;

b.        the goods that were the subject of transmigrante agency services often originated outside of Texas, in various states within the United States, and were transported to the Southern District of Texas to obtain agency services;

c.        the equipment and supplies necessary to transport the goods that were the subject of transmigrante agency services traveled in interstate commerce;

d.        the payments transmigrantes made to purchase equipment and supplies, as well as to purchase goods that were the subject of transmigrante agency services, traveled in interstate commerce; and

e.        the payments transmigrantes made to defendants and their co-conspirators for transmigrante agency services traveled in interstate commerce.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

## COUNT TWO

### Combination and Conspiracy to Monopolize
### (15 U.S.C. § 2)

19.    The Grand Jury realleges and incorporates by reference Paragraphs 3 through 10 (describing defendants) and Paragraphs 13 through 16 (providing background), and all sub-parts thereof, of this Indictment as if fully set forth herein.

### Description of the Offense

20.    Beginning in or about 2013 and continuing to at least as late as on or about November 9, 2022, in the Southern District of Texas and elsewhere, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate,"**
**MARCO ANTONIO MEDINA,**
**RIGOBERTO BROWN,**
**PEDRO ANTONIO CALVILLO HERNANDEZ,**
**ROBERTO GARCIA VILLARREAL, a/k/a "Betin,"**
**MIGUEL HIPOLITO CABALLERO AUPART,**
**SANDRA GUERRA MEDINA,**
**MIREYA MIRANDA,**

and co-conspirators known and unknown to the Grand Jury, knowingly entered into and engaged in a combination and conspiracy to monopolize, and specifically intended to monopolize, the market for transmigrante agency services in and around the Los Indios, Texas Port of Entry and the Brownsville-Harlingen, Texas metropolitan area that includes, among other places, Cameron and Hidalgo Counties and the cities and towns of San Benito and Los Indios (the "Los Indios, Texas area"), in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

21.     The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action, the substantial terms of which were that the defendants' transmigrante forwarding agencies:

      a.     combined and conspired to acquire, maintain, and exercise monopoly power collectively; and

      b.     operated as a single entity (which some defendants called the "empresa" or company), led by defendant MARTINEZ and his associates, to acquire, maintain, and exercise monopoly power;

in the market for transmigrante agency services in the Los Indios, Texas area. The combination and conspiracy engaged in by the defendants and co-conspirators was carried out through various anticompetitive acts, including restraints that are *per se* unlawful under the Sherman Act, and threats and acts of violence. The threats and acts of violence were aimed at forcing transmigrante forwarding agencies to abide by the prices and market allocations agreed to by the conspiring

agencies and otherwise deterring market participants, including new entrants and disruptive outsiders, from threatening the stability, operation, and continued existence of the conspiracy to monopolize.

## Co-Conspirators

22.     Various companies and individuals, known and unknown to the Grand Jury, participated as unindicted co-conspirators to commit the offense charged in this count and performed acts and made statements in furtherance of it.

23.     Whenever in this Indictment reference is made to any act, deed, or transaction of any corporate entity, the allegation means that the corporate entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

## Manner and Means of the Combination and Conspiracy

24.     For the purpose of forming and carrying out the charged combination and conspiracy, defendants MARTINEZ, MEDINA, BROWN, GARCIA, CALVILLO, CABALLERO, GUERRA, MIRANDA, and their co-conspirators did those things that they combined and conspired to do, including, among other things:

a.     participated in, led, coordinated, maintained, and monitored a price-fixing and market-allocation conspiracy among knowing and willing co-conspirators, as described above in Count One;

b.     exercised control over rival, non-conspiring transmigrante agencies in the Los Indios, Texas area by forcing them, through means including threats and acts of violence, to participate in "The Pool" where agency revenues were pooled together and divided pursuant to percentages agreed to by the conspiring agencies;

9

   c.  exercised control over rival, non-conspiring transmigrante agencies in the Los Indios, Texas area using exclusive patente relationships to force non-conspiring agencies to work on "commission," an arrangement where non-conspiring agencies were required to pay conspiring agencies to access patente broker services, and to charge the fixed prices agreed to by the conspiring agencies;

   d.  exercised control over the transmigrante agency services market in the Los Indios, Texas area by charging an extortion tax—referred to as a "piso"—for each vehicle a transmigrante transported across the Los Indios Free Trade Bridge;

   e.  deterred, with threats and acts of violence, new entrants and disruptive outsiders that operated outside of or refused to participate in "The Pool" or otherwise posed a threat to the stability, success, or continued existence of the combination and conspiracy to monopolize, for example, by seeking to develop patente relationships without authorization from the defendants and their co-conspirators;

   f.  engaged in communications and discussions—including at in-person meetings and via telephones, text messages, social media, and online messaging platforms—to monitor and further the combination and conspiracy to monopolize; and

   g.  used extortion, threats, and acts of violence and intimidation to promote a climate of fear throughout the market for transmigrante agency services in the Los Indios, Texas area and to prevent market participants, including transmigrante agencies and their clients, from operating freely and competitively or resisting the operations of the conspiracy to monopolize.

**Trade and Commerce**

25.     The Grand Jury realleges and incorporates by reference Paragraph 18 (Count One "Trade and Commerce"), and all sub-parts thereof, of this Indictment as if fully set forth herein.

26.     The market for transmigrante agency services in the Los Indios, Texas area constituted a substantial and appreciable part of commerce among the several states and with foreign nations. The market involved millions of dollars of transmigrante agency revenues per year and thousands of vehicles transported by transmigrantes across state lines in the United States and across the U.S.-Mexico border each year.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 2.

## COUNT THREE

**Conspiracy to Interfere with Commerce by Extortion**
**(18 U.S.C. § 1951(a))**

27.     The Grand Jury realleges and incorporates by reference Paragraphs 3, 4, 6, and 7 (describing defendants) and Paragraphs 13 through 16 (providing background), and all sub-parts thereof, of this Indictment as if fully set forth herein.

28.     Defendant DIEGO CEBALLOS-SOTO ("CEBALLOS-SOTO") was a Mexican national who worked in the Southern District of Texas and held an immigrant visa.

29.     Defendant CARLOS YZAGUIRRE ("YZAGUIRRE") was a U.S. citizen who resided in the Southern District of Texas.

30.     Beginning in or about 2013 and continuing to at least as late as on or about November 9, 2022, in the Southern District of Texas and elsewhere, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "CUATE,"**
**MARCO ANTONIO MEDINA,**
**PEDRO ANTONIO CALVILLO HERNANDEZ,**
**ROBERTO GARCIA VILLARREAL a/k/a "BETIN,"**
**DIEGO CEBALLOS-SOTO,**
**CARLOS YZAGUIRRE,**

and co-conspirators known and unknown to the Grand Jury, did conspire to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by means of extortion, as those terms are defined in Title 18, United States Code, Section 1951, that is, the defendants conspired to take and obtain the property of transmigrantes, transmigrante agencies, and other transmigrante market participants namely, (1) U.S. currency and (2) the right to pursue a lawful business including by freely soliciting business and customers, with the transmigrantes', agencies', and market participants' consent induced by the wrongful use of force, violence, and fear, including fear of economic loss.

### Overt Acts

31.     In furtherance of the conspiracy and to achieve its objects, the defendants and others known and unknown to the Grand Jury, committed or caused to be committed, the following overt acts, among others, in the Southern District of Texas and elsewhere:

a.     Forced rival, non-conspiring transmigrante agencies and transmigrante market participants to charge prices fixed and agreed upon by conspiring agencies;

b.     Forced rival, non-conspiring transmigrante agencies and transmigrante market participants to participate in "The Pool," where revenues were pooled together and divided pursuant to percentages agreed to by the conspiring agencies;

c.     Forced rival, non-conspiring transmigrante agencies and transmigrante market participants to work on "commission" and access patente services only through defendants' exclusive relationships;

d.     Forced rival, non-conspiring transmigrante agencies and transmigrante market participants to pay, for safe passage through Mexico, a "piso" extortion fee of $40

per vehicle in or about 2013, which was later raised in or about 2017 or 2018 to $65 per vehicle and again, by 2019, to $80 per vehicle.

e.      In or about July and August 2018, defendants MARTINEZ and MEDINA exchanged WhatsApp messages that C.R., who managed a transmigrante customs business and was refusing to pay the piso fee and pay revenues into the Pool, needed to be given a beating because of C.R.'s refusal to pay. MARTINEZ and MEDINA also complained about C.R. charging low prices, undermining the Pool, and disrupting agreed-upon Pool percentages because she took away a large number of transactions.

f.      On or about July 29, 2018, conspirator and Pool member GUERRA sent a WhatsApp message to another conspirator and Pool member, GARCIA a/k/a "Betin," stating that "Matamoros" was waiting for "El Guero" (a reference to MARTINEZ) to give the order to punish C.R.

g.      In or about August 2018, defendants MEDINA and CALVILLO exchanged repeated WhatsApp messages complaining that C.R., to whom they referred using vulgar and derogatory terms, was not cooperating with the Pool and refused to pay. CALVILLO suggested to MEDINA that MEDINA should take action to make her pay, and CALVILLO reported to MEDINA about his own actions to pressure C.R. to pay.

h.      On or about September 20, 2018, conspirators, known and unknown to the Grand Jury, texted C.R. to give orders for C.R. to back off from the bridge and to stop doing business in the transmigrante industry. The conspirators warned C.R. that C.R.'s family members had already been located and they identified themselves as being from the Plaza of Matamoros.

i.        On or about September 27, 2018, E.O., an employee and business associate of C.R., was assaulted in Mexico by persons unknown to the Grand Jury in Mexico while E.O. was escorting transmigrante clients. The assailants told E.O. that they worked for Cuate (a reference to MARTINEZ) and that this is what happens when you do not cooperate.

j.        On or about February 22, 2019, A.A. and her boyfriend F.C. were kidnapped in Mexico. A.A.'s father had a special Mexican certification that allowed A.A.'s father to verify customs documents to ensure their compliance with Mexican customs rules. A.A.'s father was one of C.R.'s employees. Both A.A. and F.C. heard their kidnappers say that the kidnapping was because of A.A.'s father's work for C.R.

k.        In or about February and March 2019, defendants MARTINEZ and MEDINA, as well as other conspirators, complained about C.R.'s refusal to pay the piso fee and C.R.'s refusal to pay revenues into the Pool. They also complained about C.R.'s low prices. They discussed these issues in-person and through WhatsApp messages.

l.        On or about March 7, 2019, C.R. and her transmigrante agency client Rocio Alderete ("Alderete") were shot just across the border in Mexico while helping to organize transmigrante drivers into a caravan. Alderete died on the scene. C.R. survived. After the shooting, C.R. left the transmigrante industry.

m.        On or about March 7, 2019, transmigrante agency owners and employees met at a Holiday Inn in Harlingen, Texas, within the Southern District of Texas, to agree on prices for transmigrante agency services and to discuss the reallocation of Pool revenue. Approximately $44,000 cash in Pool money was brought to this meeting.

n.      On or about October 23, 2019, L.G., a transmigrante agency owner, refused to participate in the Pool and pay the piso fee, and L.G. began working with J.H., a patente unaffiliated with the defendant transmigrante agencies.

o.      On or about October 24, 2019, conspirators unknown to the Grand Jury burned vehicles belonging to a client of a transmigrante agency that was accessing patente services through L.G.'s relationship with J.H.

p.      On or about November 5, 2019, three of L.G.'s employees, one of whom was also her nephew, were shot in Mexico near the Los Indios port of entry. One victim, Abelardo Flores Mora, died at the scene. A second, Rodrigo Martin del Campo, died after being transported to a hospital located in the Southern District of Texas. And the third, L.G.'s nephew Oscar Guerrero, died months later in the U.S. from the gunshot wounds.

q.      On or about November 12, 2019, K.F., one of L.G.'s transmigrante clients, was kidnapped and robbed in Mexico.

r.      On or about November 27, 2019, L.G.'s brother, O.G., was shot at in his vehicle while driving near the Los Indios port of entry on the Mexican side.

s.      In or about October, November, and December 2019, J.H., the patente who was working with L.G., received threatening phone calls from conspirators unknown to the Grand Jury. The callers told J.H. that he was not authorized to work in the transmigrante industry and told him to stop working. The callers threatened J.H.'s life, saying they knew where his offices were located and who his family was.

t.      In or about late December 2019 and early January 2020, defendant CEBALLOS-SOTO sent J.H. WhatsApp messages that J.H. took to be threats and warnings.

15

u.      On or about December 12, 2019, L.G. met in-person with CEBALLOS-SOTO at a Wendy's restaurant in Harlingen, TX. At that meeting, CEBALLOS-SOTO communicated to L.G. that he had met with Cuate (a reference to MARTINEZ) and that, as directed by Cuate, she owed a $50,000 fine for, among other reasons, working with an unauthorized patente, and that she owed additional money for unpaid piso fees on prior transactions.

v.      On or about December 16, 2019, L.G. paid approximately $47,000 to defendants CEBALLOS-SOTO and YZAGUIRRE, as partial payment of the fine and prior unpaid piso fees.

w.      On or about December 20, 2019, L.G. paid approximately $42,000 to defendants CEBALLOS-SOTO and YZAGUIRRE, again as partial payment of the fine and prior unpaid piso fees.

x.      Defendant CEBALLOS-SOTO texted a picture of the calculation of the fines and fees L.G. owed. This photo was saved in or about December 2019 in the iCloud account of defendant MARTINEZ.

y.      On or about December 23, 2019, YZAGUIRRE met in-person with L.G. and other transmigrante agency owners who were accessing patente services through L.G.'s relationship with J.H., the unauthorized patente. At this meeting, YZAGUIRRE communicated that the agencies were to stop working with the unauthorized patente, and he warned the agencies that those associated with L.G. were at risk. Attendees were not allowed to have phones in this meeting, and according to YZAGUIRRE, steps were being taken to detect if anyone was recording the meeting.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1951(a).

16

## COUNT FOUR

### Interference with Commerce by Extortion
### (18 U.S.C. § 1951(a))

32.     The Grand Jury realleges and incorporates by reference Paragraphs 3, 28, and 29

(describing defendants) and Paragraphs 13 through 16 (providing background) and 31, and all

sub-parts thereof, of this Indictment as if fully set forth herein.

33.     From in or about October 2019 to in or about January 2020, in the Southern

District of Texas and elsewhere, defendants

### CARLOS FAVIAN MARTINEZ, a/k/a "CUATE,"
### DIEGO CEBALLOS-SOTO, and
### CARLOS YZAGUIRRE,

aided and abetted by one another, did obstruct, delay, and affect commerce and the movement of

articles and commodities in commerce by means of extortion, as those terms are defined in Title

18, United States Code, Section 1951, that is, the defendants did take and obtain the property of

L.G., namely (1) U.S. currency and (2) the right to pursue a lawful business including by freely

soliciting business and customers, with L.G.'s consent induced by the wrongful use of force,

violence, and fear, including fear of economic loss.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTIONS 1951(a) and 2.

## COUNT FIVE

### International Money Laundering Conspiracy
### (18 U.S.C. § 1956)

34.     The Grand Jury realleges and incorporates by reference Paragraphs 3, 4, 6, 28,

and 29 (describing defendants) and Paragraphs 13 through 16 (providing background) and 31,

and all sub-parts thereof, of this Indictment as if fully set forth herein.

35.     Defendant JUAN HECTOR RAMIREZ AVILA ("RAMIREZ") was a Mexican

national who worked in the Southern District of Texas and held an immigrant visa.

36.     Defendant JOSE de JESUS TAPIA FERNANDEZ ("TAPIA") was a Mexican national who worked in the Southern District of Texas and held an immigrant visa.

37.     Beginning in or about 2013 and continuing to at least as late as on or about November 9, 2022, in the Southern District of Texas and elsewhere, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate,"
MARCO ANTONIO MEDINA,
PEDRO ANTONIO CALVILLO HERNANDEZ,
DIEGO CEBALLOS-SOTO,
CARLOS YZAGUIRRE,
JUAN HECTOR RAMIREZ AVILA, a/k/a "Juanito," and
JOSE de JESUS TAPIA FERNANDEZ,**

did knowingly conspire and agree with each other and with others, known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, namely: to transport, transmit, and transfer and attempt to transport, transmit, and transfer monetary instruments, that is U.S. currency, from a place in the United States, that is in the Southern District of Texas, to a place outside the United States, that is Mexico, and from a place outside the United States, that is Mexico, to a place in the United States, that is in the Southern District of Texas, (1) with the intent to promote the carrying on of specified unlawful activity, that is extortion, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of said form of unlawful activity in violation of Title 18 United States Code, Section 1956(a)(2)(A); and (2) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity, that is extortion, and knowing that such transportation, transmission, or represents the proceeds of said form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, location, source,

18

ownership, or control of the proceeds of said unlawful activity in violation of Title 18 United States Code, Section 1956(a)(2)(B)(i).

## Manner and Means of the Conspiracy

38.     The allegations contained in Paragraph 31 (Count Three overt acts), and all sub-parts thereof, are realleged and incorporated by reference as though fully set forth herein.

39.     During the course of the conspiracy, defendants MARTINEZ, MEDINA, CALVILLO, GARCIA, CEBALLOS-SOTO, YZAGUIRRE, RAMIREZ, and TAPIA engaged in international money laundering activities by conspiring to transport U.S. currency from the U.S. into Mexico and from Mexico into the U.S. to promote specified unlawful activity, that is extortion.

40.     During the course of the conspiracy, defendant MARTINEZ instructed defendant MEDINA to deposit funds into bank accounts controlled by MARTINEZ and N.G. MARTINEZ also instructed MEDINA to deliver funds to defendant RAMIREZ, who on certain dates deposited the funds into accounts owned by MARTINEZ, C.S., and N.G.

41.     During the course of the conspiracy, defendant TAPIA wired funds from foreign bank accounts into American bank accounts to finalize the purchase of property on behalf of defendant MARTINEZ.

## Overt Acts

42.     In furtherance of the conspiracy and to achieve its objectives, the defendants and others, known and unknown to the Grand Jury, committed or caused to be committed the following overt acts, among others, in the Southern District of Texas and elsewhere:

a.      On or about January 29, 2019, an employee of defendant MEDINA was stopped at the Brownsville and Matamoros International Bridge attempting to smuggle approximately $14,839.00 dollars from the United States into Mexico. When the

employee was interviewed, the employee stated that the money was from the employer, AGENCY C. The employee was in possession of an ENTITY G paystub, a Bank of America debit card in the name of defendant MEDINA, and Bank of America statements for ENTITY G account ending in 7178. ENTITY G is affiliated with AGENCY C.

b.      On or about March 7, 2019, transmigrante agency owners and employees met at a Holiday Inn, located within the Southern District of Texas. At this meeting, agents seized approximately $44,000 cash in illegal pool and extortion proceeds.

c.      On or about December 16, 2019, defendant YZAGUIRRE smuggled approximately $47,280.00 in extortion proceeds from the United States into Mexico. The collection of the extortion fees was arranged by defendant CEBALLOS-SOTO on behalf of defendant MARTINEZ.

d.      On or about December 20, 2019, defendant YZAGUIRRE smuggled approximately $42,105.00 in extortion proceeds from the United States into Mexico. The collection of the extortion fees was arranged by defendant CEBALLOS-SOTO on behalf of defendant MARTINEZ.

e.      During the course of the conspiracy, specifically between on or about January 1, 2014 through on or about April 5, 2022, transmigrante exports totaled approximately 675,000 exports resulting in the payment of at least approximately $27,000,000 in extortion fees.

f.      On or about January 9, 2018, defendant MARTINEZ instructed defendant MEDINA to make a cash deposit into a Wells Fargo owned by N.G. in the amount of $5,060.00, which involved the proceeds of a specified unlawful activity, that is extortion.

g.      On or about June 25, 2018, defendant MARTINEZ instructed defendants MEDINA and RAMIREZ to make a cash deposit into a Bank of America account owned

by defendant MARTINEZ in the amount of $4,500.00, which involved the proceeds of a specified unlawful activity, that is extortion.

     h.     On or about June 25, 2018, defendant MARTINEZ instructed defendants MEDINA and RAMIREZ to make a cash deposit into a Bank of America account owned by defendant MARTINEZ in the amount of $4,350.00, which involved the proceeds of a specified unlawful activity, that is extortion.

     i.     On or about February 6, 2019, defendant TAPIA wired $249.988.00 from a Mexican bank (Banco Mercantil Del Norte) account to an account of an American bank within the Southern District of Texas (International Bank of Commerce), utilized by San Jacinto Title Services of Texas, to facilitate the acquisition of a property (2700 Solera Drive, Mission, Texas 78572) on behalf of defendant MARTINEZ.

     j.     On or about March 13, 2019, defendant TAPIA wired $299,988.00 from a Mexican bank (Banco Mercantil Del Norte) account to an account of an American bank within the Southern District of Texas (International Bank of Commerce), utilized by San Jacinto Title Services of Texas, to facilitate the acquisition of a property (2700 Solera Drive, Mission, Texas 78572) on behalf of defendant MARTINEZ.

     k.     On or about July 26, 2019, defendant TAPIA wired $299,988.00 from a Mexican bank (Banco Mercantil Del Norte) account to an account of an American bank within the Southern District of Texas (Plains Capital), utilized by J.T., to facilitate the acquisition of a property (2700 Solera Drive, Mission, Texas 78572) on behalf of defendant MARTINEZ.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 1956.

## COUNT SIX

**Money Laundering
(18 U.S.C. § 1956)**

43.     On or about January 9, 2018 and in the amount of $5,060.00, in the Southern

District of Texas, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate" and
MARCO ANTONIO MEDINA,**

aided and abetted by one another, did knowingly conduct and attempt to conduct the financial

transaction affecting interstate and foreign commerce, namely: the making of a cash deposit into a

Wells Fargo bank account, owned by N.G., which involved the proceeds of specified unlawful

activity, that is extortion, knowing that the transaction was designed in whole and in part to

conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said

specified unlawful activity, and that while conducting and attempting to conduct such financial

transaction, the defendant knew that the property involved in the financial transaction, represented

the proceeds of some form of unlawful activity.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE,
SECTIONS 1956(a)(1)(B)(i) and 2.

## COUNT SEVEN

**Money Laundering
(18 U.S.C. § 1956)**

44.     On or about June 25, 2018 and in the amount of $4,500.00, in the Southern

District of Texas, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate,"
MARCO ANTONIO MEDINA, and
JUAN HECTOR RAMIREZ AVILA, a/k/a "Juanito,"**

aided and abetted by one another, did knowingly conduct and attempt to conduct the financial

transaction affecting interstate and foreign commerce, namely: the making of a cash deposit into a

Bank of America bank account owned by defendant MARTINEZ, which involved the proceeds of specified unlawful activity, that is extortion, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction, the defendants knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE,
SECTIONS 1956(a)(1)(B)(i) and 2.

## **COUNT EIGHT**

**Money Laundering**
**(18 U.S.C. § 1956)**

45.     On or about June 25, 2018 and in the amount of $4,350.00, in the Southern District of Texas, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate,"**
**MARCO ANTONIO MEDINA, and**
**JUAN HECTOR RAMIREZ AVILA, a/k/a "Juanito,"**

aided and abetted by one another, did knowingly conduct and attempt to conduct the financial transaction affecting interstate and foreign commerce, namely: the making of a cash deposit into a Bank of America bank account owned by defendant MARTINEZ, which involved the proceeds of specified unlawful activity, that is extortion, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction, the defendants knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE,
SECTIONS 1956(a)(1)(B)(i) and 2.

## COUNT NINE

**Money Laundering
(18 U.S.C. § 1956)**

46.     On or about February 6, 2019 and in the amount of $249,988.00, in the Southern

District of Texas, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate," and
JOSE de JESUS TAPIA FERNANDEZ,**

aided and abetted by one another, did knowingly conduct and attempt to conduct the financial

transaction affecting interstate and foreign commerce, namely: the wiring of funds into an

International Bank of Commerce bank account owned by San Jacinto Title Services of Texas,

which involved the proceeds of specified unlawful activity, that is extortion, knowing that the

transaction was designed in whole and in part to conceal and disguise the nature, location,

source, ownership, and control of the proceeds of said specified unlawful activity, and that while

conducting and attempting to conduct such financial transaction, the defendants knew that the

property involved in the financial transaction represented the proceeds of some form of unlawful

activity.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE,
SECTIONS 1956(a)(1)(B)(i) and 2.

## COUNT TEN

**Money Laundering
(18 U.S.C. § 1956)**

47.     On or about March 13, 2019 and in the amount of $299,988.00, in the Southern

District of Texas, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate," and
JOSE de JESUS TAPIA FERNANDEZ,**

aided and abetted by one another, did knowingly conduct and attempt to conduct the financial

transaction affecting interstate and foreign commerce, namely: the wiring of funds into an

International Bank of Commerce bank account owned by San Jacinto Title Services of Texas,

which involved the proceeds of specified unlawful activity, that is extortion, knowing that the

transaction was designed in whole and in part to conceal and disguise the nature, location,

source, ownership, and control of the proceeds of said specified unlawful activity, and that while

conducting and attempting to conduct such financial transaction, the defendants knew that the

property involved in the financial transaction represented the proceeds of some form of unlawful

activity.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE,
SECTIONS 1956(a)(1)(B)(i) and 2.

## **COUNT ELEVEN**

**Money Laundering
(18 U.S.C. § 1956)**

48.     On or about July 26, 2019 and in the amount of $299,988.00, in the Southern

District of Texas, defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate," and
JOSE de JESUS TAPIA FERNANDEZ,**

aided and abetted by one another, did knowingly conduct and attempt to conduct the financial

transaction affecting interstate and foreign commerce, namely: the wiring of funds into a Plains

Capital bank account owned by J.T., which involved the proceeds of specified unlawful activity,

that is extortion, knowing that the transaction was designed in whole and in part to conceal and

disguise the nature, location, source, ownership, and control of the proceeds of said specified

unlawful activity, and that while conducting and attempting to conduct such financial transaction,

the defendants knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

ALL IN VIOLATION OF TITLE 18, UNITED STATES CODE,
SECTIONS 1956(a)(1)(B)(i) and 2.

## FORFEITURE ALLEGATIONS

The Grand Jury further charges that:

49.     Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §§ 981(a)(1)(C) and 1963(a), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), in the event of the defendants' convictions.

## NOTICE OF CRIMINAL FORFEITURE

### (18 U.S.C. § 982(a)(1))

50.     Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the defendants

**CARLOS FAVIAN MARTINEZ, a/k/a "Cuate,"**
**MARCO ANTONIO MEDINA,**
**PEDRO ANTONIO CALVILLO HERNANDEZ,**
**ROBERTO GARCIA VILLARREAL a/k/a "Betin,"**
**DIEGO CEBALLOS-SOTO,**
**CARLOS YZAGUIRRE, and**
**JUAN HECTOR RAMIREZ AVILA, a/k/a "Juanito,"**

that upon conviction of the commission of a violation of Title 18, United States Code, Section 1956, all property, real or personal, involved in the money laundering offense or traceable to such property is subject to forfeiture.

## PROPERTY SUBJECT TO FORFEITURE

51.     Defendant MARTINEZ is notified that the property subject to forfeiture includes, but is not limited to, the following:

26

a.      Building and property located at 21370 Military Highway, San Benito, Texas 78586 - SOUTH 281 SUBDIVISION LOTS 7 & 8 BLK 1 (CAB 1 SLOT 2118-B 2119-AB 2120-A) - Property IDs: 186460 & 186461;

b.      Residence and property located at 1011 Travis Street, Mission, Texas 78572 - MALMAISON LUXE AT TRINITY LOT 20 - Property ID: 715969;

c.      Residence and property located at 2700 Solera Drive, Mission, Texas 78572 - SHARYLAND PLANTATION VILLAGE SOLERA PH 1 LOT 6 - Property ID: 593189; and

d.      Residence and property located at 2606 Solera Drive, Mission, Texas 78572 - SHARYLAND PLANTATION VILLAGE SOLERA PH 1 LOT 5 - Property ID: 593188.

52.     Defendant MEDINA is notified that the property subject to forfeiture includes, but is not limited to, the following:

a.      Building and property located at FM 2520, San Benito, Texas 78586 - SAN PEDRO DE CARRISITOS GRANT SHARE 24 TR 1 & 2, 10.0 ACS OUT OF 19.95 ACRES OF 127.75 ACRES CIPRESS RANCH OF THE LANDRUM RESERVE - Property ID: 419886; and

b.      Building and property located at FM 2520, San Benito, Texas 78586 – SAN PEDRO DE CARRISITOS GRANT SHARE 24 TR 1 & 2 9.95 OUT OF 19.95 ACRES OF 127.75 ACRES CIPRESS RANCH OF THE LANDRUM RESERVE  - Property ID: 192566.

## MONEY JUDGMENT AND SUBSTITUTE ASSETS

53.     The United States may seek the imposition of a money judgment against the

defendants. Defendants are notified that in the event that one or more conditions listed in Title

21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other

property of the defendants up to the total value of the property subject to forfeiture.


TRUE BILL

Original Signature on File

FOREPERSON OF THE GRAND JURY


JENNIFER B. LOWERY
United States Attorney
Southern District of Texas

By: *Steven D. Mellin*

STEVEN D. MELLIN
PAUL MARIAN
Assistant United States Attorneys
Southern District of Texas


DAVID L. JAFFE
Chief
Organized Crime and Gang Section
U.S. Department of Justice

By: *Christina Taylor*

CHRISTINA TAYLOR
Trial Attorney
Organized Crime and Gang Section
U.S. Department of Justice


JONATHAN KANTER
Assistant Attorney General
DOHA G. MEKKI
Principal Deputy Assistant Attorney
   General
MARVIN N. PRICE
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

By: *Jacklin Chou Lem*

JACKLIN CHOU LEM
BRITTANY MCCLURE
MICHAEL G. LEPAGE
Trial Attorneys
Antitrust Division
U.S. Department of Justice